# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------x
JUAN IZQUIERDO,

                               Plaintiff,

        -against -

34TH STREET DINER INC.,
SCOTT CAMPBELL,
TED DANIIL,
GEORGE KRPEYAN, and
ALEXANDROS SGOURDOS,

                               Defendants.
--------------------------------------------------------x

Index No. 157525-2020

**JURY DEMAND**

PLAINTIFF JUAN IZQUIERDO, by his attorneys Goddard Law PLLC, complains of Defendants as follows:

## **NATURE OF THE ACTION**

1.     Plaintiff brings this action to remedy discrimination in the terms and conditions of his employment on the basis of his race, color, ethnic characteristics, ancestry, national origin, sex and gender, familial status, and caregiver status; retaliation for taking paternity leave and for complaining about a hostile work environment; and aiding and abetting this discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the New York City Human Rights Law, New York City Administrative Code §§ 8-107, 8-502 ("NYCHRL"); and the New York State Human Rights Law, Executive Law §§ 296 ("NYSHRL").

2.     Plaintiff and other Hispanic employees were treated discriminatorily by Defendants, including being subjected to a hostile work environment, on account of their race and ethnicity. When Plaintiff complained about the hostile work environment, it continued, and

Plaintiff was retaliated against; Defendants finally terminated his employment for his complaints and for taking a paternity leave to which he was entitled.

3.      Plaintiff seeks declaratory and injunctive relief, lost wages, monetary damages for pain and suffering, punitive damages, his attorney fees and costs incurred in pursuing this relief, and all other appropriate legal and equitable relief.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

4.      As a court of general jurisdiction, this Court has jurisdiction over the claims asserted herein.

5.      The Court has jurisdiction over Defendant 34th Street Diner Inc. because it is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 481 Eighth Avenue, New York, New York.

6.      The Court has jurisdiction over the four individual Defendants because they regularly transact business in the State of New York, including at one or more of the restaurants owned and operated by Defendant 34th Street Diner Inc. in the New Yorker Hotel located at 481 Eighth Avenue, New York, New York.

7.      Venue is appropriate in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in New York County.

8.      On or about July 23, 2020, Plaintiff filed a Charge of Discrimination with the U.S Equal Employment Opportunity Commission ("EEOC").  On July 24, 2020, the EEOC issued Plaintiff a Notice of Right To Sue, which stated the EEOC's determination that it was unlikely it would be able to complete its administrative processing within 180 days from the filing of the Charge.

2

## THE PARTIES

9.      Plaintiff is Hispanic male who resides in the County of Queens, State of New York.

10.     At all times relevant herein, Defendant 34th Street Diner Inc. was and is a corporation organized and existing under the laws of the State of New York, with its principal place of business located in offices and facilities within the building of the New Yorker Hotel, 481 Eighth Avenue, New York, New York.  Defendant 34th Street Diner Inc. operates several restaurants in the New Yorker Hotel, including Butcher & Banker, where it employed Plaintiff as a server.

11.     Defendant Scott Campbell (hereinafter "Defendant Executive Chef Campbell") was, at all times relevant, the Executive Chef of Butcher & Banker Restaurant and in that capacity acted in the capacity of a manager; media reports feature him as the face of the restaurant and state that he spent years preparing the restaurant for its opening in 2017.  He regularly directs the work of Butcher & Banker kitchen and service employees, and regularly directed the work of Plaintiff.  Upon information and belief, he has hiring and firing power over the restaurant's kitchen staff.  It is unknown whether he has an ownership interest in Defendant 34th Street Diner Inc. and/or the power to do more than carry out personnel decisions made by employees other than kitchen staff.  If discovery reveals that he does, then he will be liable as Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

12.     Defendant Ted Daniil (hereinafter "Defendant Co-Owner Daniil") acted at all times relevant in the capacity of a manager of Butcher & Banker Restaurant and was actively involved in its day-to-day operations.  Upon information and belief, he had the power to hire and fire its employees and, as reported by news media, has an ownership interest in Defendant 34th Street Diner Inc.  Because he had an ownership interest and/or power to do more than carry out personnel

3

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 5 of 38

decisions made by others, he was Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

13. Defendant George Krpeyan (hereinafter "Defendant GM Krpeyan) was at all relevant times the General Manager of the Butcher & Banker Restaurant operated by Defendant 34th Street Diner Inc. Defendant GM Krpeyan was Plaintiff's direct supervisor during Plaintiff's employment and regularly exercised his authority over hiring and firing and directing the work of all Butcher & Banker employees. Because he had power to do more than carry out personnel decisions made by others, he was Plaintiff's employer within the meaning of the NYSHRL and NYCHRL. It is unknown whether Defendant GM Krpeyan has an ownership interest in Defendant 34th Street Diner Inc.

14. Defendant Alexandros Sgourdos (hereinafter "Defendant CEO & Co-Owner Sgourdos") is, according to the New York Division of Corporations' online entity information, the Chief Executive Officer of Defendant 34th Street Diner Inc. He acted at all times relevant in the capacity of a manager of Butcher & Banker Restaurant and was actively involved in its day-to-day operations. Upon information and belief, he had the power to hire and fire its employees and has an ownership interest in Defendant 34th Street Diner Inc. Because he had an ownership interest and/or power to do more than carry out personnel decisions made by others, he was Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

### FACTUAL ALLEGATIONS

### Plaintiff is Hired by Defendant and Is an Excellent Server

15. In or around December 2017, Plaintiff was hired at Defendants' restaurant, Butcher & Banker, as a server.

16. Butcher & Banker is a high-end steakhouse located in a luxurious space in the

4

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 6 of 38

basement of the New Yorker Hotel which, decades ago, served as a bank vault.

17. Immediately upon joining Butcher & Banker, Plaintiff became one of its best servers. Plaintiff frequently had the highest sales among the restaurant's servers and received stellar online reviews, and many regular customers specifically asked for him as their server.

18. At Butcher & Banker Restaurant, employees pooled their nightly tips together, and were then given tip money based on a "point" system, where tipped employees in each service position received a percentage from the tip pool.

19. Plaintiff mentioned on several occasions to Defendant GM Krpeyan that he deserved more money in tips because he brought more money into the tip pool due to his excellent service and the large tips he regularly received. Plaintiff suggested a different system where employees can keep their own tips, so he would stop contributing to the tip money given to other, lower-performing servers. The point system for tips was never changed during Plaintiff's employment.

**Defendant GM Krpeyan Favors White Employees over Hispanic Employees**

20. Immediately upon joining Defendant, Plaintiff witnessed Defendant GM Krpeyan's preferential treatment towards white employees, especially Eastern European immigrants, at the expense of Hispanic employees.

21. Plaintiff frequently witnessed Defendant GM Krpeyan giving extra tips to server Nestor, who was a Ukrainian immigrant, as well as bussers Igli and Ledion, both Albanian immigrants. Because employees pooled their tips, when Defendant GM Krpeyan favored these white employees, he was necessarily taking away from Hispanic employees who were paid from the same pool of tip money.

22. When questioned about this behavior, Defendant GM Krpeyan made excuses. For

5

example, when a Hispanic busser was late to work, Defendant GM Krpeyan would take away "points," which correlated directly to tips, from the busser and give them to either Igli or Ledion.

23.     On one occasion on a day when Plaintiff was not scheduled for work, Plaintiff heard Hispanic employees complaining that server Nestor got extra tips from the tip pool. Plaintiff approached Defendant GM Krpeyan and asked him why server Nestor was given extra tips. Defendant GM Krpeyan told Plaintiff that server Nestor was the first server reporting to duty that day and he stayed through the closing.

24.     By giving server Nestor a larger share of the tip pool, Defendant GM Krpeyan took away from all other employees even if they did their job appropriately and showed up on time.

25.     Defendant GM Krpeyan clearly fabricated the excuse he gave to Plaintiff.

26.     On days when Plaintiff was the first server reporting to duty and stayed through closing, Plaintiff did not receive extra points like Nestor did.

### Plaintiff Reports a Server to Defendant GM Krpeyan for Racist Comments

27.     In or around January 2018, referencing a remark from President Trump about not wanting immigrants from "shithole countries," server Nestor said that he agreed that there should be more white immigrants so they could become the majority, or words to that effect.

28.     Nestor made this remark in front of the kitchen door, so Plaintiff and several other employees in the area were able to hear him.

29.     Later that day, Plaintiff reported this comment to Defendant GM Krpeyan, and told him that he found it disturbing and racist.

30.     Defendant GM Krpeyan simply replied that Nestor was an "idiot," and did nothing about it; upon information and belief, he did not talk to Nestor to tell him the comment was inappropriate and harmful.

6

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 8 of 38

**Defendant GM Krpeyan Creates a Hostile Work Environment by Treating
African-American and Hispanic Customers Worse Than White Customers**

31.     As he continued working at Butcher & Banker, Plaintiff was shocked to find that Defendant GM Krpeyan routinely disparaged African-American customers, and treated them far worse than white customers.

32.     Defendant GM Krpeyan routinely called African-American people "fucking monkeys," and told Plaintiff that African-American customers were "[Plaintiff's] people." Defendant GM Krpeyan ensured that African-American customers were always seated in Plaintiff's section, and frequently told Plaintiff "here are your people" when assigning African-American customers to his section.

33.     Defendant GM Krpeyan would also frequently assign Hispanic customers to Plaintiff's section, telling him again that these were "[Plaintiff's] people."

34.     Defendant GM Krpeyan made sure to assign the best tables to white customers, who he clearly valued more.

35.     As a result of Defendant GM Krpeyan's racist assigning of tables, all African-American customers and most Hispanic customers were on one side of the restaurant, to the extent that, it was obvious and noticeable to black and Hispanic customers that they were being seated based on their race, and they complained of this. Still, Plaintiff was an excellent server and his customers were always satisfied with his service.

36.     Defendant GM Krpeyan frequently offered birthday cake to white customers celebrating a birthday, but never, to Plaintiff's knowledge, to African-American guests celebrating a birthday.

37.     Defendant GM Krpeyan refused to accommodate African-American guests who wanted a different table or wanted to be moved to a different room, but routinely did so for white

customers.  If African-American customers sent food back, Defendant GM Krpeyan refused to go check on them, even though he did so for white customers who sent food back.

38.     In one instance, Defendant GM Krpeyan directed one of the restaurant's hostesses, Stephanie, that if someone calls to make a reservation and they "have a black people accent," to not give them a reservation. He further told her that if someone calls to make a reservation and has an "African-American name," then to not give them a reservation.  Stephanie told Plaintiff about Defendant GM Krpeyan's instructions and told him that she was extremely uncomfortable being asked to participate in Defendant GM Krpeyan's racist, discriminatory practices. Stephanie told Plaintiff that she is from Puerto Rico and has black family members, and was utterly distraught at the orders Defendant GM Krpeyan was giving her.

39.     Plaintiff was also very bothered to hear this, as he has several nieces and nephews who are half black, and he was utterly disgusted by Defendant GM Krpeyan's openly racist practices.

40.     When an African American did manage to make a reservation, Defendant GM Krpeyan would completely ignore their reservation and give the better table to a white customer. Plaintiff observed this on a number of occasions.

41.     When white customers came into the restaurant dressed up, Defendant GM Krpeyan often commented that they looked nice, but when African-American or Hispanic men came into the restaurant dressed up, he called them "drug dealers." Similarly, when African-American or Hispanic women came into the restaurant dressed up, Defendant GM Krpeyan said they "look like strippers." Defendant GM Krpeyan made these comments in front of Plaintiff and other staff members.

42.     Defendant GM Krpeyan frequently said African-American customers did not know

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 10 of 38

how to eat and did not have manners, and rolled his eyes at African-American customers.

43.    Defendant GM Krpeyan often commented to staff members that African-American customers were late because they "stay home smoking marijuana" before coming to the restaurant. When white customers were late, he did not make such comments.

44.    White staff members would frequently laugh along with and agree with Defendant GM Krpeyan's racist statements, whereas Hispanic staff members were hurt and intimidated by these comments.

45.    Plaintiff felt increasingly disturbed and upset about Defendant GM Krpeyan's unfettered racism as it continuously hurt and intimidated him, other Hispanic employees, and African-American customers for the duration of Plaintiff's employment.

### Defendant Executive Chef Campbell Repeatedly Makes Racist Comments About Defendants' Hispanic Employees

46.    Defendant Executive Chef Campbell repeatedly made racist comments about Hispanic employees of Defendant.

47.    For example, Defendant Executive Chef Campbell routinely joked in front of customers, staff members, and Defendant GM Krpeyan that the cooks from Tick Tock Diner (the lower-end diner owned and operated by Defendants in the New Yorker Hotel), who were all Hispanic, "graduated from Rikers," referring to the Rikers Island prison facility.

48.    Plaintiff was shocked that Defendant Executive Chef Campbell's blatantly racist and discriminatory jokes, insinuating that employees were criminals simply because they were Hispanic, were condoned by Defendant GM Krpeyan.

49.    On one occasion, Defendant Executive Chef Campbell went upstairs to ask for something from the cooks at Tick Tock Diner. When the cooks in the diner could not provide him with what he wanted, he came back to Butcher & Banker extremely angry.

50.     Defendant Executive Chef Campbell then angrily spouted in front of Plaintiff, Defendant GM Krpeyan, and another server Tudor that the Tick Tock Diner cooks, who were Hispanic, were "all illegal." He then stated, "If I call ICE, they will take all of them," referring to U.S. Immigrations and Customs Enforcement.

51.     Plaintiff, as an immigrant, felt extremely offended at these comments. Defendant Executive Chef Campbell stormed off, and Plaintiff told Defendant GM Krpeyan that this comment was wrong and offensive.  Defendant GM Krpeyan nodded his head in agreement and smiled in disbelief and said, "[Defendant Executive Chef Campbell] is an idiot."  Upon information and belief, Defendant GM Krpeyan did nothing further, such as tell Defendant Executive Chef Campbell that his attitude and threats were racist and harmful of the working environment in the restaurant.

52.     Plaintiff spoke with other Hispanic staff members about Defendant Executive Chef Campbell's comments, who agreed that Defendant Executive Chef Campbell was racist and disrespectful to the many employees who were immigrants, and who agreed that Defendant GM Krpeyan was failing to correct the situation.

### Plaintiff Is Subjected to Defendant Executive Chef Campbell's Racist Outburst

53.     On or around May 2019, Plaintiff was in the tight quarters of the kitchen, and attempted to pass by Defendant Executive Chef Campbell. Plaintiff repeatedly told Defendant Executive Chef Campbell "excuse me" and "I am behind you," but Defendant Executive Chef Campbell refused to move. As Plaintiff passed by Defendant Executive Chef Campbell, he lightly brushed against him.

54.     Defendant Executive Chef Campbell turned around, claimed that Plaintiff pushed him, and aggressively told Plaintiff, "Say 'excuse me.' This is America."

10

55.     Upon information and belief, Defendant Executive Chef Campbell did not move when Plaintiff attempted to pass him, because he wanted to manufacture an opportunity to make a racist remark to Plaintiff.

56.     Plaintiff, taken aback by Defendant Executive Chef Campbell's racist comment, asked him point-blank, "Are you a racist?"

57.     Defendant Executive Chef Campbell hostilely stated in response, "I'm the chef and you respect me!"

58.     Plaintiff, afraid that Defendant Executive Chef Campbell might escalate the situation further, left the kitchen. Plaintiff felt disrespected and humiliated that a chef would speak to him in such a blatantly racist and discriminatory way.

59.     Two Hispanic food runners, and a number of cooks, were in the kitchen and witnessed and heard this incident and exchange.

60.     The two Hispanic food runners who witnessed the incident later approached Plaintiff individually about how they knew Defendant Executive Chef Campbell was incredibly racist, and suggested that Plaintiff file a complaint to the Department of Labor. The two runners acknowledged that they were afraid of speaking out about this, out of fear of retaliation.

**Plaintiff Reports the Racist Incident to Defendant GM Krpeyan, Who Does Nothing**

61.     That same day, Plaintiff spoke to Defendant GM Krpeyan and told him about Defendant Executive Chef Campbell's racist outburst and belligerent refusal to let Plaintiff pass by. Defendant GM Krpeyan told Plaintiff that Defendant Executive Chef Campbell had already come to him and complained that Plaintiff pushed him. Plaintiff told Defendant GM Krpeyan that this was not true. Defendant GM Krpeyan said to Plaintiff, "I believe you." Defendant GM Krpeyan again told Plaintiff that Defendant Executive Chef Campbell was "an idiot." Upon

11

information and belief, Defendant GM Krpeyan used this remark as a way to excuse Defendant Executive Chef Campbell's racist behavior and his own failure to confront the problem and correct the racist working environment.

62.     This exchange between Plaintiff and Defendant GM Krpeyan took place at the front desk of the restaurant and was heard, at least in part, by the hostess on duty that evening, who was monitoring the desk.

63.     Plaintiff was extremely upset and disappointed that Defendant GM Krpeyan would permit this extremely hostile and racist behavior in the restaurant.

**Defendant Executive Chef Campbell Continues To Create a
Hostile Work Environment and To Target Plaintiff, While Defendant
GM Krpeyan Condones and Contributes to the Abusive Treatment**

64.     Defendant Executive Chef Campbell continued creating a hostile work environment for Plaintiff because of his race.  He either turned his back to Plaintiff when communicating the daily specials to the other servers, or asked someone else to tell Plaintiff what the daily specials were. Defendant Executive Chef Campbell also refused to speak with Plaintiff.

65.     On a few occasions, Plaintiff was the first server in the restaurant for a meal shift, and Defendant Executive Chef Campbell communicated the daily specials to Defendant GM Krpeyan, to avoid having to communicate them to Plaintiff.  Defendant GM Krpeyan then relayed the specials to Plaintiff.

66.     On one occasion, Plaintiff went to the kitchen to ask a question for a customer about a food allergy and an item on the menu.  Defendant Executive Chef Campbell ignored Plaintiff and refused to answer. Plaintiff was shocked that Defendant Executive Chef Campbell would endanger a guest at the restaurant by refusing to answer Plaintiff's question about a food allergy. Following Defendant Executive Chef Campbell's lead, the other cooks working in the kitchen also

12

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 14 of 38

did not answer Plaintiff's question.

67.     Plaintiff was forced to go to Defendant GM Krpeyan, tell him what happened, and explain that the customer needed an answer about the item on the menu.  Defendant GM Krpeyan went into the kitchen, found out the answer, and relayed it to Plaintiff so that Plaintiff could answer the customer's question.

68.     If this behavior of Defendant Executive Chef Campbell bothered Defendant GM Krpeyan, he did not say so.

69.     Nevertheless, this was a significant heightening of the hostile work environment. Rather than confront Defendant Executive Chef Campbell's obstructionist departure from the normal protocol of the restaurant whereby the chef and servers communicate frequently during the course of a meal shift about the menu items and customer requests, Defendant GM Krpeyan essentially condoned Defendant Executive Chef Campbell's shutting Plaintiff out.

70.     The chef has the most information about the food, and protocol dictates that the restaurant runs most smoothly when communication lines are least obstructed between the chef and customers.  The behavior of both Defendant Executive Chef Campbell and Defendant GM Krpeyan made Plaintiff's job of serving and satisfying the restaurant's customers much more difficult.

71.     Moreover, Plaintiff felt humiliated by the hateful treatment he received from Defendant Executive Chef Campbell, and felt humiliated by having this situation ignored by Defendant GM Krpeyan as if it was not a harmful and humiliating situation.

72.     Plaintiff suffered severe emotional distress from the added work, the shunning and abuse, and the disesteem he suffered in the eyes of his colleagues due to Defendant Executive Chef Campbell's and Defendant GM Krpeyan's treatment of him.

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 15 of 38

73.     Upon information and belief, both Defendant Executive Chef Campbell and Defendant GM Krpeyan were trying to intimidate Plaintiff and assert their sense of superiority by creating a false impression that they didn't need Plaintiff and could get along fine without him, that Plaintiff was not an equal human being who deserved respect and an unobstructed work environment.

74.     Upon information and belief, both Defendant Executive Chef Campbell and Defendant GM Krpeyan were motivated in their treatment of Plaintiff by racism and by Plaintiff's refusal to sit quietly by and tolerate that racism. They were motivated to retaliated against Plaintiff because of his previous complaints about that racism.

75.     Plaintiff repeatedly went to Defendant GM Krpeyan to complain about Defendant Executive Chef Campbell continuing to create a hostile work environment for him. For example, on one occasion, Plaintiff told Defendant GM Krpeyan, "He's going to have to talk to me, he's making my job impossible." In response, Defendant GM Krpeyan simply said, "I know," and made no assurances to Plaintiff that the behavior would stop.

### Plaintiff Reports the Hostile Work Environment to the Other Defendants, Who Also Do Nothing in Response

76.     In or around June 2019, Plaintiff mentioned to a hostess working at Butcher & Banker the racist treatment he was enduring from Defendant Executive Chef Campbell. Plaintiff approached this hostess, Vasilika, because she was the niece of Defendant CEO & Co-Owner Sgourdos. Plaintiff asked Vasilika if she would help him talk to Defendant CEO & Co-Owner Sgourdos about the treatment Plaintiff was being subjected to at the hands of Defendant Executive Chef Campbell. Vasilika told Plaintiff that she thought Defendant Executive Chef Campbell's behavior was wrong, and she thought her uncle would understand that and would be sympathetic.

77.     A few days after his conversation with Vasilika, Plaintiff was called to a meeting

Case 1:21-cv-04799   Document 1-2   Filed 05/28/21   Page 16 of 38

upstairs in the Tick Tock Diner of the New Yorker Hotel, where he found Defendant CEO & Co-Owner Sgourdos, Defendant Co-Owner Daniil, and Defendant GM Krpeyan.

78.     Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil told Plaintiff they had heard about Defendant Executive Chef Campbell's treatment of Plaintiff, and wanted to talk to him about it.  Defendant CEO & Co-Owner Sgourdos acknowledged that Vasilika had spoken to him about it, and he asked Plaintiff to explain what was happening with Defendant Executive Chef Campbell.

79.     After Plaintiff explained the history and details of Defendant Executive Chef Campbell's treatment, Defendant Co-Owner Daniil asked Plaintiff why he had not mentioned this to his supervisor, Defendant GM Krpeyan.  Plaintiff said, "I did."  In fact, Plaintiff had discussed this with Defendant GM Krpeyan several times.  Defendant GM Krpeyan did not respond to this during the meeting but just continued sitting there; he acknowledged Plaintiff's discussions with him when Defendant Co-Owner Daniil asked.

80.     Defendant Co-Owner Daniil, attempting to convince Plaintiff he was not being subject to a racist, hostile work environment, told Plaintiff that "the kitchen gets hot sometimes" and that Defendant Executive Chef Campbell's racist outburst happened "in the heat of the moment."

81.     Further attempting to downplay the racist hostile work environment, and justify Defendant GM Krpeyan's inaction, Defendant Co-Owner Daniil turned to Defendant CEO & Co-Owner Sgourdos and said, "You worked in kitchens for years, have you ever seen this happen?"

82.     Defendant CEO & Co-Owner Sgourdos said, "no, I haven't."

83.     Defendant Co-Owner Daniil asked Plaintiff if he knew that he was making "a serious accusation."

15

84.     Plaintiff responded, "Yes, this is discrimination."

85.     Defendant CEO & Co-Owner Sgourdos, seemingly unaware of how to deal with Plaintiff's complaint of discrimination, asked Plaintiff what he wanted to do about it.  He asked if Plaintiff wanted to talk to Defendant Executive Chef Campbell about it.

86.     Plaintiff responded that he did not want to speak with Defendant Executive Chef Campbell. Plaintiff feared if he spoke to Defendant Executive Chef Campbell about his racist treatment, he would only be subject to worse retaliation. Plaintiff said that he wanted them to talk to Defendant Executive Chef Campbell about his behavior.

87.     Defendant CEO & Co-Owner Sgourdos concluded the meeting by saying that they were going to "leave it" and "see what happens." Upon information and belief, neither Defendant CEO & Co-Owner Sgourdos nor Defendant Co-Owner Daniil did anything about Plaintiff's report of the racist, hostile work environment that Defendant Executive Chef Campbell was subjecting him to.

88.     Plaintiff was shocked that Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil refused to help him, and that he would be left on his own to deal with Defendant Executive Chef Campbell's racist treatment of him.

**The Racist Hostile Work Environment Continues Unabated**

89.     Despite Plaintiff's complaints to Defendants, the racist, hostile work environment continued unabated.

90.     Through the summer and fall of 2019 Defendant Executive Chef Campbell continued refusing to talk to Plaintiff, or move out of his way when Plaintiff was walking by, making Plaintiff's job extremely difficult.

91.     In or around Summer 2019, Plaintiff was standing in the kitchen and Defendant

16

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 18 of 38

Executive Chef Campbell walked directly into him, and then kept walking, all without even saying "excuse me."

92.    Plaintiff reported this incident to Defendant GM Krpeyan, who responded, "What do you want me to do, spank him?" Plaintiff was utterly distraught that Defendant GM Krpeyan would not take his complaint seriously, and implied he had no responsibility to stop the abusive behavior of Defendant Executive Chef Campbell.

93.    Plaintiff also reported this incident to Defendant CEO & Co-Owner Sgourdos, who blamed Plaintiff and said that Plaintiff should have said "excuse me."

94.    Defendant CEO & Co-Owner Sgourdos and Defendant GM Krpeyan thus rejected, or pretended to reject, that Defendant Executive Chef Campbell's hostile behavior was racially motivated and motivated by retaliation.

95.    Plaintiff felt extremely disillusioned that Defendant Executive Chef Campbell would face no consequences for his abusive and discriminatory behavior, and that Defendants implicitly condoned the behavior by taking no action.

## A Hispanic Employee Is Fired for Missing Work, While White Employees Who Miss Work Go Unpunished

96.    Other employees were also treated discriminatorily.

97.    A Hispanic hostess took a week off from work after the death of her father, and missed an additional day of work immediately after her bereavement leave ended. When she returned to work, she was summarily terminated by Defendant GM Krpeyan.  Upon information and belief, white employees failed to show up for work on occasion without calling in and were not fired.

98.    Upon information and belief, Defendant GM Krpeyan held Hispanic employees to stricter standards than white employees.

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 19 of 38

**Defendant GM Krpeyan Promotes a White Hostess
Instead of a More Experienced Hispanic Hostess**

99.    In or around summer 2019, Olia, who is a white, Eastern European immigrant, and Crystal, who is Hispanic, were both working as hostesses.  Crystal was an experienced hostess, and had asked Defendant GM Krpeyan for a promotion to cocktail waitress, but her request was denied.  Instead, Olia, who had far less experience than Crystal, was promoted to cocktail waitress by Defendant GM Krpeyan.

100.    Olia did not know the basics of the job of cocktail waitress.  For example, she did not know the difference between a "Manhattan" and an "Old Fashioned," and asked Plaintiff to explain to her which was which of the two drinks that the bartender gave her to serve.

101.    Upon information and belief, various bartenders and cocktail waitresses were upset about the decision to promote Olia, as she was inexperienced and they would now have to work harder to cover for her inexperience, and would nevertheless have to split their tips equally with her.

102.    Plaintiff believes, and other Hispanic employees believed, that Olia was promoted instead of Crystal based solely on her race.

**Plaintiff Takes a Sick Day After an On-the-Job Injury
and Defendants Fail to Complete an Accident Report**

103.    On or about August 7, 2019, Plaintiff burned his hand at the coffee machine and asked to fill out an accident report.  Defendant Co-Owner Daniil looked at Plaintiff's hand and said it looked like first- and second-degree burns, and Defendant Co-Owner Daniil thought it would be fine.  The burns were serious burns and required Plaintiff to sleep with his hand in a water bucket because the throbbing was so painful.  Plaintiff took a sick day the next day, and when he returned to work the following day Defendant Co-Owner Daniil again looked at Plaintiff's

18

hand and again said it looked fine and declined to fill out an accident report according to Defendants' policy. Upon information and belief, Defendant Co-Owner Daniil would have filled out an accident report for a non-Hispanic employee with similar burns, or for an employee who had not complained about a hostile work environment, or for an employee who had not complained of Defendants' racism against employees.

### Defendants Discourage Plaintiff from Taking
### More Than a Minimal Paternity Leave

104.	In or around February 2019, Plaintiff learned that his wife was pregnant and immediately thereafter informed Defendant GM Krpeyan that his wife was pregnant. Plaintiff stated that, in light of his wife's miscarriage and medical emergency related to that pregnancy in 2018, he wanted Defendant GM Krpeyan to be aware that it might be a risky pregnancy and Plaintiff might need to tend to his wife and unborn baby at some points during the pregnancy.

105.	At no point did Defendant GM Krpeyan explain to Plaintiff his right to paternity leave under the federal Family Medical Leave Act ("FMLA") or New York State's Paid Family Leave law ("NYS PFL").

106.	Plaintiff research and learned that he was entitled to up to 10 weeks of partially paid paternity leave under NYS PFL.

107.	In or around September 2019, Plaintiff told Defendant GM Krpeyan that the baby's due date was October 23, 2019, and asked for two weeks of paternity leave to spend time with the newborn. Defendant GM Krpeyan did not object. Plaintiff then followed up with Defendant Co-Owner Daniil, who took care of the paperwork and told Plaintiff that he would receive partial pay for the paternity leave.

108.	Approximately a week later, Plaintiff approached Defendant GM Krpeyan again, and said that he thought he would need more time to bond with his baby and care for the baby and

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 21 of 38

his wife, and requested three weeks (instead of two weeks) for his paternity leave.

109. Defendant GM Krpeyan told Plaintiff "no." He said that three weeks was "too long." Plaintiff told Defendant GM Krpeyan that he was entitled to ten weeks of paternity leave. GM Krpeyan responded, "Yes, but not with pay." Plaintiff did not wish to argue with Defendant GM Krpeyan because he knew that Defendant Co-Owner Daniil was handling the paperwork and was acquainted with the mechanics of paternity leave, including the partial pay, pursuant to NYS PFL.

110. Defendant GM Krpeyan never got back to Plaintiff about his request for three weeks of paternity leave.

111. Plaintiff was upset, anxious, and depressed that Defendant GM Krpeyan seemed resistant to supporting him as a new father who wished to spend time bonding with and caring for his soon to be born child.

### Plaintiff Misses a Day of Work Taking His Sick Wife to the Hospital and Is Berated for His Previous Use of Sick Days

112. On or about October 16, 2019, after a week of hospitalization in Peru, Plaintiff's wife's brother died. Plaintiff had told Defendant GM Krpeyan that the brother was hospitalized that week and that Plaintiff's wife was extremely emotional and upset about not being able to visit her brother.

113. On or about the morning of October 17, 2019, Plaintiff took his wife to a prenatal care appointment at the hospital, and she was found to have high blood pressure. She was kept under observation at the hospital for the rest of the day. At noon, Plaintiff sent a text message to Defendant GM Krpeyan saying that he would not be able to come in to work for the dinner shift because he was with his wife who was under observation for high blood pressure.

114. Defendant GM Krpeyan did not respond to the text message before Plaintiff's start

time of 4:00 p.m., and this made Plaintiff anxious and upset, especially because Defendant GM Krpeyan knew that Plaintiff's wife had experienced trouble with pregnancy, and he knew that her brother had been hospitalized all week. Upon information and belief, Defendant GM Krpeyan's failure to respond to the text message was a passive-aggressive intimidation tactic designed to discourage Plaintiff from using his accrued sick days.

115. Plaintiff texted Defendant GM Krpeyan again at 4:41 p.m., who now approved the day off.

116. Nevertheless, on or about October 21, 2019, Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil called Plaintiff upstairs to a meeting. In the meeting, they berated Plaintiff for taking a sick day on October 17, despite the fact that Defendant GM Krpeyan had approved Plaintiff's request.

117. Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil interrogated Plaintiff about his use of sick days that year. Defendant Co-Owner Daniil and Defendant CEO & Co-Owner Sgourdos argued with Plaintiff about how many sick days he had taken in 2019. Plaintiff explained that they were thinking of an injury he had suffered in November 2018, and that his sick days in 2019 were less than five.

118. Defendant Co-Owner Daniil advised Plaintiff that his sick days had to be "filed with the state" and demanded that Plaintiff give them a doctor's note for any sick days.

119. Plaintiff had previously heard Defendant Co-Owner Daniil use this phrase and assert that sick days had to be "filed with the state." Upon information and belief, Defendant Co-Owner Daniil was lying about this, and he knew that there was no reporting requirement for the use of sick days mandated by New York City's Paid Sick Leave Law; he used this phrase as an intimidation tactic to prevent Plaintiff and other employees from using the sick leave and family

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 23 of 38

leave that they were entitled to.

120. Plaintiff challenged Defendant Co-Owner Daniil and Defendant CEO & Co-Owner Sgourdos on one point, telling them that he was ***not*** required to give them a doctor's note for the use of a single sick day. Plaintiff knew that New York City's Paid Sick Leave Law allows employees to use accrued sick days for care of a sick family member and other purposes as well, and allows employers to request documentation for the use of more than three consecutive sick days. Upon information and belief, Defendant Co-Owner Daniil and Defendant CEO & Co-Owner Sgourdos knew this as well, and Defendant CEO & Co-Owner Sgourdos did not need to "investigate" whether a doctor's note was required. Upon information and belief, Defendant CEO & Co-Owner Sgourdos did not "investigate" or follow up with Plaintiff, because he knew that the only purpose of requiring a doctor's note for each sick day used by Plaintiff was to intimidate him.

121. Upon information and belief, Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil interrogated Plaintiff about his sick days because they knew that Plaintiff had just used a sick day to take his wife to her prenatal appointment, where she was found to be suffering dangerously from high blood pressure, and they wanted to intimidate Plaintiff so that he would not use the accrued sick days and paternity leave to which he was entitled.

122. Upon information and belief, Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil did not want male employees like Plaintiff taking time off to care for their newborns and sick family members, and believed that this was women's responsibilities.

123. Upon information and belief, Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil also wanted to intimidate and retaliate against Plaintiff because Plaintiff had regularly protested the racially discriminatory treatment of customers and employees, and they resented Plaintiff's complaints about this and his insistence on a discrimination-free

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 24 of 38

workplace.

**Plaintiff's Wife Gives Birth**
**and Plaintiff Takes a Short Paternity Leave but Is Denied a Longer Leave**

124. On or about the evening of October 23, 2019, Plaintiff's wife was scheduled to induce labor and Plaintiff took a sick day.

125. Early in the morning on October 24, 2019, Plaintiff's wife had a cesarean section operation and their daughter was born.

126. From on or about October 24 to November 8, 2019, Plaintiff took pre-approved paternity leave. On or about November 11, 2019, Plaintiff returned to work.

127. Shortly thereafter, Plaintiff spoke with Defendant Co-Owner Daniil about taking additional leave time in December and January. Defendant Co-Owner Daniil told Plaintiff that he needed to submit new paperwork for that additional leave request. Plaintiff believed this was incorrect under NYS PFL, and called Defendants' insurance company and confirmed that the original request for NYS PFL sufficed for all ten weeks to which Plaintiff was entitled, and that no new paperwork needed to be submitted for a second installment of leave time within 12 months of the baby's birth.

128. Plaintiff asked Defendant GM Krpeyan for a second installment of paternity leave – specifically, three more weeks of paternity leave to start on December 23, 2019. Plaintiff explained that he needed more time to spend at home with his wife, who was recovering from an unexpected cesarean section, and to bond with and care for his newborn child.

129. Defendant GM Krpeyan said three more weeks was "too long" and abruptly ended the conversation there and walked away.

130. Plaintiff was extremely anxious and frustrated that Defendants continued denying him the paternity leave that he was entitled to under NYS PFL.

23

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 25 of 38

131.    Upon information and belief, Defendants tried to prevent Plaintiff from taking a second portion of the paternity leave to which he was entitled because they did not want male employees like Plaintiff taking time off to care for their newborns and sick family members, and believed that this was women's responsibilities; and because they wanted to retaliate against Plaintiff because Plaintiff had regularly protested the racially discriminatory treatment of customers and employees, and they resented Plaintiff's complaints about this and his insistence on a discrimination-free workplace.

**Plaintiff Is Forced To Resign in Order To Take Paternity Leave**

132.    On or about November 21, 2019, Plaintiff told Defendant GM Krpeyan that he would be resigning his position, and his last work day would be December 13.

133.    Fearful that he would face retaliation if he asked again for more paternity leave, and feeling humiliated and intimidated at the position into which Defendants had boxed him, Plaintiff told Defendant GM Krpeyan that he had found another job with benefits, even though he had not actually done so.

134.    The simple truth is that, after being intimidated from taking paternity leave, and then outright denied all but two weeks of paternity leave by Defendants, Plaintiff was forced to resign in order to spend time with his wife and newborn. He was too embarrassed and humiliated by the treatment he had experienced from Defendants to tell them straightforwardly that he was quitting because he needed to take care of his wife and bond with his baby.

135.    Plaintiff asked Defendant GM Krpeyan if things did not work out at his "new job," could he come back to work here? Defendant GM Krpeyan would not commit to any answer.

136.    A few weeks later, Plaintiff told Defendant GM Krpeyan that he would like to rescind his resignation and come back to work at Defendants' restaurant after the weeks he was

24

going to spend caring for his wife and baby. Plaintiff now admitted to Defendant GM Krpeyan that he did not have another job.

137.    Defendant GM Krpeyan said perhaps he would fire another server with a lot of complaints and poor reviews in order to rehire Plaintiff, and then laughed as if he was only joking. Defendant GM Krpeyan said, "We'll see, we'll see."

138.    Plaintiff felt upset and insulted that Defendant GM Krpeyan laughed about the situation Plaintiff was forced into, and that he seemed to have no concern for Plaintiff's well-being or livelihood.

139.    Upon information and belief, Defendant GM Krpeyan's admission that Plaintiff was a better server than Defendants' other servers was sincere, but Defendant GM Krpeyan's unwillingness to allow Plaintiff to take the paternity leave to which Defendants knew he was entitled, and to return to work after that leave, trumped all other motivations and led Defendant GM Krpeyan to disregard Plaintiff's rights to paternity leave and continued employment, just as he had all along been disregarding Plaintiff's right to a workplace free from discrimination and race-based hostile treatment.

140.    Upon information and belief, Defendant CEO & Co-Owner Sgourdos and Defendant Co-Owner Daniil condoned Defendant GM Krpeyan's actions, and all of them were motivated by retaliation against Plaintiff for demanding a discrimination-free workplace and for insisting on his rights as a father to bond with his baby.

141.    As explained below, Plaintiff *did* eventually receive all 10 weeks of NYS PFL to which he was entitled, but he achieved this through his own self-advocacy and challenging of Defendant GM Krepayan's, Defendant CEO & Co-Owner Sgourdos's, and Defendant Co-Owner Daniil's intimidation and willful interference with his right to take that leave.

### Defendant GM Krpeyan Orders Plaintiff To Deny a Table to a
### Party of African American Customers a Larger Table, to Their Outrage

142.   In or around early December 2019, a group of African American customers were seated at two different tables despite being in the same party. They expressed to Plaintiff that they would like one big table to share together, and clearly saw a large table available for them to sit at.

143.   Plaintiff saw no reason these customers should not have the larger table, especially since it was late in the evening, the restaurant would soon be closing, and there were no further reservations for the larger table that evening.   Plaintiff asked Defendant GM Krpeyan for permission to move them to the larger table, and Defendant GM Krpeyan refused, without explanation.  Plaintiff could not understand, and pressed the question several times, but Defendant GM Krpeyan would not budge and told Plaintiff not to move them.   Defendant GM Krpeyan explained only by saying that the party had made two separate reservations, and then arrived late.

144.   The customers were indignant and began criticizing and upbraiding Plaintiff, believing that Plaintiff was the one who was denying them permission to move.  They accused Plaintiff of being racist.  The customer went to the front desk to complain.

145.   To deal with this scene, Defendant GM Krpeyan spoke with the customer at the front desk and told her that her party could move to the larger table, and re-assigned them to a different server.   Defendant GM Krpeyan's sudden change of mind made Plaintiff look even worse, and reinforced the customers' impression that it was Plaintiff who had denied them the opportunity to move to the larger table.

146.   Upon information and belief, Defendant GM Krpeyan would have quickly and readily accommodated a group of white customers with the same request, as customer reviews posted on various restaurant review websites suggest.

147.   Upon information and belief, Defendant GM Krpeyan wanted to make Plaintiff

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 28 of 38

look bad out of retaliation for Plaintiff's pressing for a discrimination-free workplace and for his right as a father to take paternity leave to bond with his baby and as a husband to take care of his sick wife.

148.    One of the busboys working that evening saw what happened, and, as he later told Plaintiff, he quietly let the African-American customers know that it was not Plaintiff who had denied their request to move to the larger table.

149.    Plaintiff was humiliated to be yelled at in front of customers and staff members alike for a racist decision that was not his and that he did not agree with, and then for Defendant GM Krpeyan to pretend that Plaintiff was the one who made the racist decision in the first place.

150.    It is hard to imagine a more egregious or blatant racist act than Defendant GM Krpeyan's.

### Another Server Resigns from Defendant and Plaintiff Asks To Be Reinstated

151.    Defendants did not allow Plaintiff to rescind his resignation after he explained it to them. Because he expected to be without a job, he filed a claim for the balance of the paternity leave to which he was entitled under NYS PFL (covering the period December 15, 2019 through February 5, 2020) and told Defendant GM Krpeyan that the partial pay he would receive through Defendants' NYS PFL insurer would be of help to him "just in case" Defendants were not able to bring him back on as a server, as he and Defendant GM Krpeyan had discussed.

152.    On or about December 13, 2019, Plaintiff worked his last day in the restaurant. Plaintiff left, hoping that Defendant GM Krpeyan would keep his word and hold a spot open for him when he returned from the time he needed to spend with his wife and baby.

153.    On or about December 25, 2019, server Nestor resigned his position and worked his last day in the restaurant. After Nestor resigned, there was an open position for server.

27

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 29 of 38

154.    On or about December 31, 2019, Plaintiff picked up his last pay check from Defendants and asked Defendant GM Krpeyan if he could be reinstated to take Nestor's server position as they had earlier discussed, and Defendant GM Krpeyan said he would "think about it."

155.    Plaintiff also spoke to Defendant Co-Owner Daniil and explained that he would like to return in January.  Defendant Co-Owner Daniil said the decision was up to Defendant GM Krpeyan.

156.    On or about January 16, 2020, Plaintiff again spoke with Defendant GM Krpeyan and said that he would like to come back to work. Defendant GM Krpeyan claimed he did not have a spot for Plaintiff. Plaintiff told Defendant GM Krpeyan that he could work part-time and pick up shifts whenever needed. Defendant GM Krpeyan laughed at Plaintiff and denied his request to be reinstated.

157.    Plaintiff was extremely upset and frustrated at Defendant GM Krpeyan's treatment.

158.    Upon information and belief, the only reason Defendant GM Krpeyan did not hire Plaintiff back was because he knew that Plaintiff spoke up and insisted on a discrimination-free workplace and insisted on taking paternity leave despite Defendants' efforts to prevent him from doing so.

159.    In or about late January 2020, Plaintiff again went to the restaurant to pick up his W-2 form and asked Defendant GM Krpeyan if there were any shifts available for him to work. Defendant GM Krpeyan said there were no shifts for Plaintiff.

160.    On or about February 7, 2020, Plaintiff met with Defendant GM Krpeyan once again and asked to be reinstated. Defendant GM Krpeyan admitted to Plaintiff that he was the best server in the restaurant. Plaintiff explained that he had a family to take care of and needed the job. Defendant GM Krpeyan simply said "we'll see" and "I'll think about it," but did not assure

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 30 of 38

Plaintiff one way or another about the future of his employment at Defendant.

161.    On or around February 18 and 24, 2020, Plaintiff texted Defendant GM Krpeyan that he was available to pick up shifts in case it was busy or a server was taking a day off, but he got no response.

162.    Finally, in March 2020, Plaintiff asked Defendants' restaurant consultant to intercede on his behalf and ask Defendants to reinstate him.  The restaurant consultant agreed to do so, and reported back to Plaintiff that Defendants were unwilling to reinstate him.

163.    Upon information and belief, and as set forth above, Defendants were given many opportunities to reconsider their discriminatory treatment of Plaintiff, but rejected each and every such opportunity because they were committed to denying Plaintiff discrimination-free employment, committed to permitting a hostile work environment, committed to intimidating fathers and interfering with and obstructing their right to take leave to bond with their newborn babies, and committed to intimidating male employees and interfering with and obstructing their right to take sick leave and family leave to take care of sick family members.

## AS AND FOR A FIRST CLAIM
### (Race and Ethnicity Discrimination in Violation of
42 U.S.C. § 1981, Civil Rights Act of 1866)
Against All Defendants

164.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

165.    As set forth above, each of Defendants discriminated against Plaintiff on the basis of his race and ethnicity and in so doing prevented him from reaping the benefits of his contract for employment services.

166.    As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

29

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 31 of 38

167.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights.

168.     Defendants' malicious treatment of Plaintiff entitles him to punitive damages.

169.     Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

170.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for these violations of law.

### AS AND FOR A SECOND CLAIM
**(Race and Ethnicity Discrimination and Retaliation in Violation of
Title VII of the Civil Rights Act of 1964)
Against Defendant 34th Street Diner Inc.**

171.     Plaintiff repeats and re-alleges the allegations made hereinbefore.

172.     As set forth above, Defendant discriminated against Plaintiff on the basis of his race and ethnicity and in so doing altered the terms and conditions of his employment, including by creating and condoning a hostile work environment and terminating his employment.

173.     As set forth above, Defendant retaliated against Plaintiff for complaining of race and ethnicity discrimination by depriving him of various privileges including paid leave enjoyed by other employees, by targeting him with racial and ethnic discrimination not experienced by other employees, and by terminating his employment.

174.     As a direct and proximate result of Defendant's discrimination and retaliation, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

175.     Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's protected rights.

176.     Defendant's malicious treatment of Plaintiff entitles him to punitive damages.

177.     Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

178.     By reason of Defendant's discrimination and retaliation, Plaintiff is entitled to all remedies available for these violations of law.

**AS AND FOR A THIRD CLAIM**
**(Race and Ethnicity Discrimination and Retaliation in Violation of**
**NYSHRL and NYCHRL)**
**Against All Defendants**

179.     Plaintiff repeats and re-alleges the allegations made hereinbefore.

180.     Upon information and belief, each of Defendants is Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

181.     As set forth above, Defendants discriminated against Plaintiff on the basis of his race and ethnicity and in so doing altered the terms and conditions of his employment, including by creating and condoning a hostile work environment and terminating his employment.

182.     As set forth above, Defendants retaliated against Plaintiff for complaining of race and ethnicity discrimination by depriving him of various privileges including paid leave enjoyed by other employees, by targeting him with racial and ethnic discrimination not experienced by other employees, and by terminating his employment.

183.     As a direct and proximate result of Defendants' discrimination and retaliation, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

184.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's State-law and City-law protected rights.

185.     Defendants' malicious treatment of Plaintiff entitles him to punitive damages.

31

Case 1:21-cv-04799  Document 1-2  Filed 05/28/21  Page 33 of 38

186.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

187.    By reason of Defendants' discrimination and retaliation, Plaintiff is entitled to all remedies available for these violations of law.

### AS AND FOR A FOURTH CLAIM
**(Sex and Gender Discrimination and Retaliation in Violation of NYSHRL and NYCHRL)**
**Against Defendants 34th Street Diner Inc., Daniil, Krpeyan, and Sgourdos**

188.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

189.    Each of Defendants is Plaintiff's employer within the meaning of the NYSHRL and NYCHRL.

190.    As set forth above, Defendants discriminated against Plaintiff on the basis of his sex and gender by interfering with his rights to take accrued sick pay and paternity leave to care for his sick family members and to bond with his child and assist with child-rearing, and by terminating his employment.

191.    Upon information and belief, Defendants don't believe that fathers should be entitled to time off to care for or bond with their children, and don't believe that husbands should be entitled to time off to care for sick family members.

192.    As set forth above, Defendants retaliated against Plaintiff for complaining of sex and gender discrimination by depriving him of various privileges enjoyed by other employees, by targeting him with scrutiny of his sick time and leave requests not experienced by other employees, and by terminating his employment.

193.    As a direct and proximate result of Defendants' discrimination and retaliation, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 34 of 38

194.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's State-law and City-law protected rights, entitling Plaintiff to punitive damages.

195.     Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

196.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for these violations of law.

### AS AND FOR A FIFTH CLAIM
**(Familial Status Discrimination and Retaliation in Violation of NYSHRL)**
**Against Defendants 34th Street Diner Inc., Daniil, Krpeyan, and Sgourdos**

197.     Plaintiff repeats and re-alleges the allegations made hereinbefore.

198.     Each of Defendants is Plaintiff's employer within the meaning of the NYSHRL.

199.     By the acts described above, Defendants discriminated against Plaintiff on the basis of his familial status by interfering with his rights to take accrued sick pay and paternity leave to care for his sick family members and to bond with his child and assist with child-rearing, and by terminating his employment.

200.     Upon information and belief, Defendants don't believe that fathers should be entitled to time off to care for or bond with their children, and don't believe that husbands should be entitled to time off to care for sick family members.

201.     As set forth above, Defendants retaliated against Plaintiff for complaining of familial status discrimination by depriving him of various privileges enjoyed by other employees, by targeting him with scrutiny of his sick time and leave requests not experienced by other employees, and by terminating his employment.

202.     As a direct and proximate result of Defendants' discrimination and retaliation, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

203.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's State-law protected rights, entitling Plaintiff to punitive damages.

204.     Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

205.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for these violations of law.

### AS AND FOR A SIXTH CLAIM
**(Caregiver Status Discrimination and Retaliation in Violation of NYCHRL)**
**Against Defendants 34th Street Diner Inc., Daniil, Krpeyan, and Sgourdos**

206.     Plaintiff repeats and re-alleges the allegations made hereinbefore.

207.     Each of Defendants is Plaintiff's employer within the meaning of the NYCHRL.

208.     By the acts described above, Defendants discriminated against Plaintiff on the basis of his caregiver status by interfering with his rights to take accrued sick pay and paternity leave to care for his sick family members and to bond with his child and assist with child-rearing, and by terminating his employment.

209.     Upon information and belief, Defendants don't believe that fathers should be entitled to time off to care for or bond with their children, and don't believe that husbands should be entitled to time off to care for sick family members.

210.     As set forth above, Defendants retaliated against Plaintiff for complaining of caregiver status discrimination by depriving him of various privileges enjoyed by other employees,

Case 1:21-cv-04799 Document 1-2 Filed 05/28/21 Page 36 of 38

by targeting him with scrutiny of his sick time and leave requests not experienced by other employees, and by terminating his employment.

211.    As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

212.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's City-law protected rights, entitling Plaintiff to punitive damages.

213.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

214.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for these violations of law.

### AS AND FOR A SEVENTH CLAIM
**(Aiding and Abetting Discrimination and Retaliation
in Violation of NYSHRL and NYCHRL)
Against Defendants Campbell, Daniil, Krpeyan, and Sgourdos**

215.    Plaintiff repeats and re-alleges the allegations made hereinbefore.

216.    Defendants acted to aid and abet the discrimination and retaliation complained of herein, in violation of the NYSHRL and NYCHRL.

217.    As a direct and proximate result of Defendants' aiding and abetting, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits and severe mental anguish and emotional distress.

218.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's State-law and City-law protected rights, entitling Plaintiff to punitive damages.

219.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which he is entitled that is requested herein.

220.    By reason of Defendants' aiding and abetting, Plaintiff is entitled to all remedies available for these violations of law.

### JURY DEMAND

221.    Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring that the acts and practices complained of herein are in violation of the Civil Rights Acts of 1866 and 1964, NYSHRL, and NYCHRL;

(b)     permanently enjoining and restraining the acts and practices complained of herein, and ordering Defendants to submit to anti-discrimination training and monitoring;

(c)     awarding Plaintiff monetary damages for lost wages and benefits and for his pain and suffering in an amount to be determined at trial but not less than $5 million;

(d)     awarding Plaintiff punitive damages in an amount to be determined at trial but not less than $5 million;

(e)     awarding Plaintiff the costs of this action together with his reasonable attorney fees incurred in pursuing these claims; and

(f)     granting such other and further relief to Plaintiff as this Court deems appropriate.

Dated: New York, New York
          March 30, 2021

Respectfully submitted,

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: _____/s/ Megan S. Goddard_____

36

Megan S. Goddard
Anthony P. Consiglio
39 Broadway, Suite 1540
New York, New York 10006
(646) 504-8363
megan@goddardlawnyc.com
anthony@goddardlawnyc.com